## GENERAL ELECTRIC CO. v. P. R. MALLORY & CO., Inc.

## SAME v. SAVE ELECTRIC CORPORATION.

(Circuit Court of Appeals, Second Circuit.   April 7, 1924.)

Nos. 293, 294.

1. Courts ⬅1—In determining scientific questions, do not sit as scientists, but as weighers of evidence.

In determining scientific questions, courts do not sit as scientists, but as weighers of evidence.

2. Patents ⬅328—1,018,502 held unanticipated and infringed.

Just and Hanaman patent, No. 1,018,502, relating to tungsten filament lamps, *held* unanticipated and infringed.

3. Patents ⬅120—That one patent covers process, and another covers device and discloses another process, held not double patenting.

That one patent covers process of making device, and another covers device itself, with disclosure of another process, *held* not double patenting.

4. Patents ⬅312(2)—Statement of patentee in other litigation and arguments of attorneys held properly excluded.

Prima facie application for patents should be granted or refused on file wrapper and nothing else, and statements of patentee in other litigations and arguments of attorneys were properly excluded.

⬅For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**5. Patents ⬡⇒328—1,180,159, claims 4, 5, 12, 13, held valid and infringed.**

    Langmuir patent, No. 1,180,159, claims 4. 5, 12, 13, *for* electric lamp, *held* valid and infringed.

Appeals, Respectively, from the District Court of the United States for the Southern and Eastern Districts of New York.

Separate suits in equity by the General Electric Company against P. R. Mallory & Co., Inc., and against the Save Electric Corporation. From decrees for plaintiff (294 Fed. 562, 567), defendants appeal. Affirmed.

Appeals from decrees in equity, entered in the suit against Mallory in the Southern, and against Save in the Eastern, District of New York. Both suits are upon Just and Hanaman (hereinafter called Just) patent, 1,018,502, and Langmuir, 1,180,159; throughout the record constant reference is made to Coolidge, 1,082,933. The decrees below are alike in tenor, and declare infringement of Just as to all claims, and of Langmuir as to 4, 5, 12, and 13.

The proven infringement on the part of Mallory was making and selling filament wire, knowing and intending that it should be used in both vacuum and gas-filled lamps. This wire, of tungsten and drawn apparently by the Coolidge method, contained thoria, and showed by analysis about ".0047 per cent." of iron. As to Save, infringement proven was the manufacture and sale of lamps substantially like the Alpha product declared to infringe in General Electric v. Alexander (D. C.) 277 Fed. 290.

The litigation over these patents, in addition to the case just cited, is found in the Laco-Phillips decision, 233 Fed. 96, 147 C. C. A. 166, broadly upholding Just, and quoting the claims of that patent; the Nitro-Tungsten decision (D. C.) 261 Fed. 606, affirmed 266 Fed. 994, broadly sustaining claims 4, 5, 12, and 13 of Langmuir, and quoting them; the Independent Lamp Case (D. C.) 267 Fed. 824, declaring valid every claim in suit of Coolidge, and the Continental Case (C. C. A.) 280 Fed. 846, denying the defense of implied license as to Langmuir. The patents, or some of them, have also been sustained in New Jersey (suit versus the Incandescent Company [D. C.] 280 Fed. 856, and suit versus Nitrogon Company [D. C.] 292 Fed. 384) and Rhode Island (suit versus Brite-Lite Company [D. C.] 290 Fed. 967). The corresponding Langmuir patent in Great Britain has there been upheld by the House of Lords. British Thomson-Houston Co. v. Corona, Limited, judgment filed December 19, 1921.

Opinions below in the cases now at bar will be found in 286 Fed. 175–180, on motion for injunction pendente lite, and on final hearing in 294 Fed. 562, and 567.

Duell, Warfield & Duell, of New York City (Frederick P. Warfield and L. A. Watson, both of New York City, of counsel), for appellants.

Frederick P. Fish and Hubert Howson, of New York City, and Albert G. Davis and Alexander D. Lunt, both of Schenectady, N. Y., for appellee.

Before ROGERS, HOUGH, and MANTON, Circuit Judges.

HOUGH, Circuit Judge (after stating the facts as above). The bills herein allege in common form adjudications favorable to the patents in suit and rendered before these bills were filed. The answer to these allegations suggests the scope and purpose of a defense trailing through eight octavo volumes. That answer—

"admits that [the patents of Just and Langmuir] were respectvely held valid [by the courts of this circuit], but alleges that such findings were influenced by tacit as well as direct representations and statements as to the nature

⬡⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

and characteristics of the subject-matter of the patents, and as to analagous subject-matter, and as to the state of the art, and as to proceedings on behalf of plaintiff before the United States Patent Office, made on behalf of plaintiff, which were untrue and/or misleading."

We are thus advised that defendants believe previous decisions, if not wrong in reasoning, wrong in result, because plaintiff has succeeded in putting before us untruthful and misleading evidential material. This is a serious charge; it has moved us to consider at length a record more bulky than that of any previous suit on the same patents or either of them.

We find that plaintiff has introduced substantially the same evidence that gave it victory in earlier cases. Defendants have treated it as "an axiom that this case must as to the facts stand on its own feet, irrespective of the prior litigation." Standing "on its own feet" means, as we find, putting in every defense heretofore overruled when advanced by other defendants, and adding such new or newly named matter as could be found. This we grant is a legal enough method of "making a record" for ultimate appeal purposes; it would be *legal* if there were *nothing* but old matter.

We have, then, considered this record to ascertain (1) whether there is any new evidence tending to invalidate any material finding of fact hitherto made; and (2) whether anything now shown justifies the charge of suppressio veri or suggestio falsi on the part of plaintiff, made by the above quotation from answer.

We first consider the record in respect of the Just patent. Our previous holding as to Just may be thus summarized: It was a new and useful invention of high order to offer to the world, with directions how to make it, an incandescent light filament of substantially pure, dense, and coherent tungsten. We are now told that "fact evidence wholly new" should induce the following findings; i. e., when Just disclosed his alleged invention it was (a) old to select tungsten as filament material, and (b) obvious and, indeed, known that tungsten could be made into filaments. There is a certain boldness of assertion about this that rouses to investigation. Dissection of argument following assertion shows that defendant—

(1) Discards, as based on evidence insufficient, if not worse, all the fact findings of this or other courts in other cases. That every man is entitled to have his own case decided on the facts proven in that case is true; but it is not true that triers of fact must lay aside opinions previously gained on the same facts, because new counsel appear to argue them. The whole system of case law depends upon the presumed correctness of previous decisions, though that presumption may admittedly be overset by new facts or by new argument. We may summarily say now that we find no argument leading us to depart from 233 Fed. 96, 147 C. C. A. 166, assuming only the evidence there before us, and we have that evidence repeated in substance, except the deposition (taken in Germany in 1914) of Hanaman.

[1, 2] (2) Searching now for new facts, we find it said that Welsbach (British 1,535 of 1898 and American 976,526), plus the disclosures of Regnault (Annales de Chemie et Physique, vol. 62), of Guichard

(Comptes Rendû, vol. 131), and of Blau (contained in an application. for United States patent filed in October, 1905), either left Just no room for invention, or actually informed the world of the novelty hitherto found by the courts to have been first proclaimed by Just.

(3) The concept of using tungsten for a filament was in Whitney and Beckwith, when they were employed by plaintiff, and before Just's effective date.

(4) Just's patent is open to the charge of double patenting, as well as

(5) To that of being supported by a fraudulent oath.

(6) Defendants' filaments do not infringe because they are not substantially pure tungsten.

Defendants' position under the second of the above headings is most elaborately worked out by Dr. Lamb, their expert witness, whose opinions and assertions constitute the major portion of the new matter laid before us. Questions of the development and application of many sciences come before courts, especially in patent causes, and it seems necessary from time to time to point out that we sit, not as scientists, but as weighers of evidence; even when experts differ, we must apply to their conflicting statements, not any knowledge of our own on the subject of contradiction, but the knowledge of human frailties and virtues obtained by previous consideration of evidence on less recondite matters. Human nature does not vary much, whether the subject in hand be science or scandal, veracity or volts.

Counsel drew out Dr. Lamb's conclusion by the following questions (quoted in substance):

"Considering the disclosure of Welsbach. (British 1,535 of 1898), in your opinion would the chemical knowledge of the art prior to 1904 have been sufficient to teach an ordinarily skilled operator familiar with that art the chemical and practical possibility of fabricating a filament of the metal tungsten, following the general method and steps of the method proposed by Welsbach, in the production of filaments of the metal osmium, as you have defined such Welsbach method and steps? A. Yes."

On cross-examination Dr. Lamb was asked whether, down to the year 1905, he could name an "article of use to mankind fashioned out of tungsten metal, pure or impure." He said in answer:

"If I am asked to name an object of use to mankind, I must cite filaments of tungsten manufactured by the De Lodyguine patents. If the question, however, implies that the object mentioned shall actually have so functioned, and shall have been widely used, and hence of great value to mankind, my answer will be that I know of no such object of tungsten."

In other words, any reasonably skilled man of the time could practically have made tungsten filaments, after reading Welsbach, as far back as 1898; yet men kept trying osmium at about 400 times the price of tungsten, and particularly Welsbach, one of the great inventors of his time, did so; so that until 1905, while any ordinarily skilled man could have used tungsten for filaments, no one put it to any useful purpose in its substantially pure state. This, by all the rules derived from the study of human nature, is too great a strain upon credulity. It discredits the giver of such evidence.

The defenses urged under this branch of argument are really not new. Our opinion in 233 Fed. disposed of the Welsbach defense by

pointing out what that eminently competent man had done in a factory apparently controlled or managed by him. What he did in his business is assuredly as persuasive as anything that he said in a patent disclosure, and it amounted to the osmium lamp and nothing more. The British and American patents to Welsbach are substantially alike, so far as their connection with this case is concerned. We reiterate our opinion that the Welsbach disclosure tells no man how to make a tungsten filament, and point out that Dr. Lamb was given the opportunity of trying to perform the feat and could not do it. We think that the evidence of Dr. Langmuir, for plaintiff, to the effect that the Just filament cannot be produced by the Welsbach process, remains unanswered.

The essays of Regnault and Guichard are of a date when for practical purposes the art of incandescent lighting was unknown. The former suggested in 1836 a classification of metals with respect to their susceptibility to the action of oxygen, and Guichard deals with the "equilibrium conditions" between molybdenum and its oxides in mixtures of steam and hydrogen. It may be true that to one acquainted with Just's process of making tungsten filaments the suggestions of these comparatively early chemists may cause a passing wonder that, having the vision they possessed, they did not see more. But that is the history of all human endeavor, and we are unable to perceive that the reader of Welsbach, when he added Regnault and Guichard to his acquirements, would have been any nearer making a tungsten filament of substantially pure metal.

Pointing out that the De Lodyguine patents were sufficiently disposed of by Mayer, J., in 233 Fed. 96, 147 C. C. A. 166, it may be noted that we firmly adhere to our previous holding that November 4, 1904, is Just's effective date. This has scarcely been denied in previous litigations, wherefore we note as our reason for this holding that the date given is that of Just's British and French applications, and we are of the opinion that the British patent, sustained in the House of Lords October 25, 1917 (Osram, etc., Works v. Pope's Electric, etc., Co.) is a constructive reduction to practice of Just's invention as covered by the patent in suit.

Blau had worked with or for the "Auergesellschaft," which made Welsbach osmium lamps. The earliest date of conception suggested for him is 1905, though, if his doings were material, a much later date would probably be assigned him; but he is not material, because he came after Just's effective date as above held.

Thus separately considered, the matters suggested under the second heading of defense argument do not reduce Just from inventor to artisan. Collectively they only show that for some time some men had cast the eye of hope on tungsten; but neither hope nor prediction is invention. If it be admitted (which is not done) that they show Just reaching the goal of success "by a neck," that detracts nothing from his legal right to the victor's palm.

The third defense heading is the Whitney-Beckwith matter. The history of their efforts, in the laboratory of plaintiff herein, to get a metal filament in succession to that of carbon, only strengthens what we have just said about men hopefully regarding tungsten. We may add that this record shows, far more clearly than any previous one, how

little was accurately known about that not uncommon metal until Coolidge, so to speak, *tamed it,* for present purposes at all events. Nothing is material of the Whitney-Beckwith doings after Just's effective date, and we ·hold that, while Dr. Whitney hoped to get, and filed a patent claim for, "a filament for incandescent lamps composed of pure tungsten," he did not show how to get one, and did not know how himself. We think he went to Germany to find out, and found Just. As for Beckwith, he could not get the carbon out of the tungsten. We entirely agree with the court below on this defense, which in principle was ruled on in the Laco Phillips Case, by overruling defense based on the Siemens-Halske British patent. 233 Fed. 101.

[3] That double patenting exists here (fourth subdivision of argument) is a new point of law. It rests on the fact that Just's original American application contained disclosure of several processes by which a single result—i. e., the tungsten filament of the patent in suit—could be attained. The Office required division; the issue of the patent at bar was delayed for reasons sufficiently set forth in the Laco-Phillips opinion; but one divisional application, covering one process only, became No. 878,463 in 1908, four years before the master patent for the product came out of the Office; hence it is said double patenting resulted. There would be force in the argument, if there were but one process, and the only possible result thereof was the single product; but the more philosophical way to view the question is to ask whether the two patents (878,463 and 1,018,502) cover the same invention, when properly construed. Thomson, etc., v. Elmira, etc., Co., 71 Fed. 396, 18 C. C. A. 145. They do not; one being only for a process of making, and the other for the thing made, with disclosure of another process.

It is to us plain that there was no double patenting; but what the point really suggests is that the long-settled practice of the Office, requiring division of applications thought to reveal more than a single invention, leads to logical difficulties far greater than could be found in a patent covering numerous inventive concepts, provided the claims were severally confined to one invention only.

The defense of fraudulent oath (fifth subdivision of argument) is based upon the assertion that the original verified petition for Just's patent (filed July 6, 1905) set forth without any reference to German 154,262, valid from April 15, 1903, a process identical with that of the earlier German grant, wherefore it was untrue. It is enough to say of this defense that it lacks a substratum of fact. We considered that German patent in 280 Fed. 852, and are of opinion that the matter disclosed in 1905 in America was for a substantially different thing from that covered by the German patent of 1903.

This point of a false oath is in treatment (though not in legal relation) intimately connected with one question of law decided by the court below, and brought before us by assignment of error in the following form, viz. that the court erred:

"In failing to find admissible and binding against plaintiff representations made by attorneys authorized and acting on behalf of Just and Hanaman and/or on behalf of plaintiff before the Patent Office in the prosecution of other applications of Just and Hanaman, certain of said applications being divisional of the parent application eventuating in the patent in suit."

Also that error was committed:

"In declining and/or failing to find that statements of fact and/or of opinion, made by Just and/or Hanaman under oath in proceedings before the Patent Office and in litigation on [the patent in suit] heretofore brought, were admissible, competent, and binding as against plaintiff in this case."

As is sufficiently shown by the résumé of Patent Office history given in 233 Fed. 96, 147 C. C. A. 166, there were prolonged and most unusual proceedings over this patent and its allies in the Office. In the course of these prolonged proceedings statements were made on behalf of Just by various attorneys and by the applicants themselves as to what they meant, what they had done, and what they hoped to do. It amply appears, from the preface to this opinion, that litigation has not been wanting over this patent; as above noted, Hanaman was examined in the Laco-Phillips Case, and very lengthy argument has been made and printed on behalf of the patent owner.

The substance of the above assignments of error is that, treating this whole mass of litigation, whether in court or Patent Office, as an integral body of assertion for which plaintiff is responsible, appellants excerpted therefrom whatever seemed to militate against the various then existing findings of courts or the then made arguments of counsel and offered the same in evidence. The trial court ruled them out, and of this complaint is made substantially on the ground that this ruling prevented appellant from showing the series of statements, mistaken and misleading, if not worse, by which, as pleaded, the Patent Office and the courts had been misled.

It is to be noted that neither Just nor Hanaman was examined in this cause. Appellant's objections suggest three questions:

(a) Should statements, arguments, or opinions of attorneys have been received?

(b) Should statements of Just and Hanaman, made with respect to patents other than the one at bar and in the Patent Office, have been received?

(c) Should statements of the patentees, made in litigation other than this one, have been received?

We are of opinion that the rulings below were right in every instance. No authority is produced justifying the reception of statements by a patentee made in other litigations, and it would be a waste of time to point out how repugnant such a procedure would be to every Anglo-American legal concept. The distinction is obvious between using such statements upon the cross-examination of a litigant or privy, and throwing in as original evidence what such a man said somewhere else and under other circumstances.

[4] As to statements made by Just and Hanaman in prosecuting applications for American patents, other than the one in suit, we hold as matter of law that prima facie an applicant or the owner of an application is entitled to either the grant or the refusal of a patent on that which is introduced in his file wrapper, and nothing else. So far as we know or are advised, this is the first instance of trying to extract from the file wrappers of any or all of the myriad applications in the Patent Office whatever an unproduced patentee may at some time have said

derogatory to an invention that he had sold. The effort of what ought to be those very plastic regulations called rules of evidence is to produce testimonial matter relevant, competent, pertinent, material, and fair, and of these adjectives emphasis is to be laid upon the last, quite as much as upon any of the others. It is *fair* to produce a man whose mental concept and reduction thereof to practice lies at the basis of a litigation, and subject him to the fiercest cross-examination, using his previous admissions and statements as the basis thereof; but anything more unfair than to introduce that man's statements inter alios, without the possibility of further examination, we cannot imagine.

The offer of various parts of the file wrapper of the patent at bar, consisting of attorneys' arguments, statements, or deductions, was flatly opposed to the rule so often stated in this circuit, and last restated in Spalding v. Wanamaker, 256 Fed. 530, 167 C. C. A. 602. To that ruling we adhere, and deem further discussion unnecessary. We have, however, examined the excluded matter, and do not deem it necessary to prolong this opinion by discussing what it would mean, if it was permitted to mean anything, in this case.

The claim of noninfringement (sixth subdivision of argument) rests upon the assertion that defendants' filament wire is "not substantially pure tungsten." It is sought to support the argument by pointing out that in 1906 Just and Hanaman filed an application, now long abandoned, proposing, inter alia, a claim for a tungsten filament "having incorporated, throughout a small percentage of a substance capable of increasing the sintering capacity of the tungsten." The rest of the application is said to have shown that what was meant was the addition of a small proportion of thorium. The existence of this application is revealed for the first time in this record.

Suppose the application as described had been granted, would it have made any difference in the decision in the Alpha Case (C. C. A.) 280 Fed. 852? We think not, because the product patent at bar, if anything, is a master patent, and we are still convinced that it is entitled to that rank in this particular art.

We held in the case last cited that the presence or absence of a stiffener like thoria made no difference, if the effective incandescent material was substantially pure tungsten. Consequently, in the view taken by all the courts down to date, not only is the presence or absence of the stiffener, thorium or thoria, immaterial, but the existence or nonexistence of a patent specifically covering said stiffener is even more immaterial.

We think it unnecessary to add to the opinion in the case last cited further than to note that the mere trace of iron discovered by analysis of the Mallory filaments does not take away from them the character of "substantially pure tungsten." The vital point is that the iron has no function, except possibly to prove an imperfect production system, and the Mallory product functions exactly like that of Just, and for the same reason.

[5] We turn now to the Langmuir patent, and feel obliged to limit discussion on this hearing as we did in 266 Fed. 994. We have the same four claims before us that were at bar in the case just cited. Cer-

tain definitely described articles have been held to constitute infringement of those claims. As to all the other claims, the lower court was silent, and we are not called upon to speak. The decision relating to those four claims was duly pleaded by plaintiff, and we discover nothing in the answer that justifies the attempt to lug into the discussion certain other claims.

It is proven beyond peradventure that the lamps decreed below to infringe are in every essential respect the lamps of the Alpha Case, supra. It is therefore appropriate to inquire what is there newly produced in this litigation to induce variation from the findings heretofore made.

The substance of holding hitherto is that the invention before us does not relate to "any nitrogen-filled bulb with any tungsten filament in it, but a special article of special proportions and a carefully stated co-ordination of parts." The main basis of this holding, as an examination of former records will show, is the testimony of Dr. Langmuir himself, given with a lucidity which we now find even his critics admire, in a detail and with an accuracy as to places and times rare indeed, even in patent causes, and with a persuasiveness which has hitherto proved effective. That testimony has been here repeated, and it is met for the most part by the criticism of defendants' expert, Prof. Clifford, plus the story of the work of Dr. Fink.

The Fink defense is thus put in argument: Langmuir's "patent claims do not distinguish from Fink's work." We have examined the evidence on this subject, and are of opinion that Dr. Fink had no conception of the Langmuir coordination of parts, and that what he did is a typical abandoned experiment. The further exposition of this matter may well be left to the remarks of the court below upon final hearing, and to those of Bodine, J., in the Nitrogon Case, supra. Defendants' scheme of argument, based upon Prof. Clifford's views and original thought, may be thus summarized:

(1) The claims are not described by the application or disclosure.

(2) Considering the state of the art, it was not patentable invention to put a known tungsten filament into an inert gas, and in addition to require extreme elimination of water vapor; and the foregoing is so true that invention must be denied, even in respect of filaments of large diameter.

(3) The application was unwarrantably broadened in the Office to include "closely coiled" filaments.

(4) No infringement exists through gas-filled lamps with filaments of actually small diameter, nor by lamps containing argon.

We do not think it necessary, and are certain that it woud not be useful, to go over again the path of argument resulting in our former decision. There is really nothing new in this record in point of evidence except Prof. Clifford's opinion, and we are unable to find his views more persuasive than those of Dr. Langmuir, as we have found to be the case with Prof. Clifford's predecessors in the witness chair.

There is much rediscussion of filament diameters, but its applicability to the claims in suit centers around the patentee's phrase of "effective diameter." What Langmuir saw, and we still think he was the first

to see it, was that the filament for a gas-filled lamp must be large, which involved the use of a large wire. But he also saw that it was possible, by coiling, to make a reasonably fine wire (which in other respects was desirable) act like a large wire. Thus he produced a filament of effective size, which on dissection can by certain quibble or play upon words be called a fine wire.

We considered in our first decision the whole question of the terminology of the claims as well as of the disclosure. It is really covered by the doctrine so thoroughly discussed in Eibel Co. v. Minnesota & Ontario Paper Co., 261 U. S. 45, 43 Sup. Ct. 322, 67 L. Ed. 523. Eibel Process Co. v. Remington-Martin Co., 234 Fed. 624, 148 C. C. A. 390. The point is that, while critics may point out, and have pointed out, indefiniteness in language, the practical man acquainted with the art has been proven perfectly able presumably to use the patent in making what Langmuir's assignees made first, witness the multitude of infringements productive of litigation. Patents often lend themselves to fine-spun theories; but it is singular how plain they are, if they are worth anything, to the man who wishes to infringe for profit.

There is, however, one really new line of attack, not so much against the patent as an inventive act as against the practical exposition thereof. It is urged that, even though the patent be admitted as good for "high current lamps," lamps employing a "low current" are not within its scope; i. e., Langmuir did not invent a low current lamp. The difference between these two classifications of lamps depends upon amperage taken, and we fail to find any even reasonably accurate line of demarcation between what defendant calls a high current lamp and a low current lamp. The practical line of demarcation (all lamps using the same commercial voltage) appears to be with lamps of a wattage of approximately 50.

It is historically true that, when the lamps of the patent were put on the market, they were commercially successful only of sizes and wattage considerably higher than the line of demarcation above indicated. Practical operations under the patent have produced smaller sizes. Among the lamps enjoined in the Incandescent Products Case, supra, were some of 75 and 40 watts. And how far advances in technical perfection will permit production to go, we think this record shows that no man can tell.

It may be assumed (but not held) as true that, when this patent was applied for, the patentee did not know how to make and make work successfully, economically, or profitably low current lamps. But that is not the test either of invention or patent scope. It has been held, too many times to need citation, that a patentee is entitled to all the advantages of his patent, whether he understands them or not, and many a man has been enriched in fame and in money because he wrought better than he knew.

The proper inquiry is whether what are here called low current lamps are made in accordance with Langmuir's disclosure, no matter whether Langmuir ever did make them, and no matter whether he could make them when he filed application. The answer must be that all the lamps introduced in evidence in this case (we go no further) are made

in accordance with the teachings of Langmuir's disclosure, and are covered by the four claims of Langmuir's patent first above enumerated.

As to all other matters urged in argument, we are, after careful examination of everything even called new matter in this record, of the opinion that we can add nothing to the expositions given in the decisions hereinabove referred to. It is therefore concluded that this record, mostly a rechauffee of everything that has been heretofore put in evidence about these patents, leads to no new conclusions, except possibly that we discover no justification for the accusation of moral wrongdoing either in the prosecution of the patents through the Office, or in their enforcement with the courts.

Decrees affirmed, with costs.