McLAREN PRODUCTS CO. v. CONE CO. OF AMERICA.

(District Court, E. D. New York. April 14, 1925.)

1. Patents ⟨⟩283(1)—If decree will protect all parties, defense of lack of title in plaintiff is not good.

In suit for infringement of patent, where decree will amply protect all parties, defense denying plaintiff's title is not good, in view of fact that legal title was held by trustee.

2. Patents ⟨⟩328—1,071,027, claims 2, 3, 7, 23, 25, 33, 34, 35, 36, 64, 66, 67, 69, for ice cream cone machine, held valid and infringed.

Bruckman patent, No. 1,071,027, for ice cream cone machine, claims 2, 3, 7, 23, 25, 33, 34, 35, 36, 64, 66, 67, 69, held valid and infringed.

3. Patents ⟨⟩327—Adjudication that patent is valid held presumptively correct in subsequent litigation.

Although one is entitled to have his case decided on facts proven therein, former adjudications that patent is valid are presumptively correct and of strong persuasive force.

4. Patents ⟨⟩129—Receipt of license under patent and consent decree held not to estop one from showing state of art as bearing on scope of patent in subsequent suit.

Although one might be estopped from denying validity of patent under which he received license and by consent decree, he was not estopped, in subsequent suit relating to patent, from showing state of art as bearing on scope of patent.

In Equity. Suit by the McLaren Products Company against the Cone Company of America for infringement of a patent. Decree for plaintiff.

Cooper, Kerr & Dunham, of New York City, Albert E. Dieterich, of Washington, D. C., Henry J. Savage, of Chicago, Ill., and Thomas J. Byrne, of New York City, for plaintiff.

Fred B. Fetherstonhaugh and Russel Smart, both of Ottawa, Canada, James J. Kennedy and Sharon Graham, both of New York City, and Harold G. Fox, of Toronto, Canada, for defendant.

INCH, District Judge. This is a patent suit. The suit is brought by a trustee of the legal title for the benefit of Alexander Mc-Laren, the equitable owner, etc., and the McLaren Products Company, an exclusive licensee.

The defendant is a corporation organized under the state of Delaware, and having a regular place of business at Brooklyn, N. Y., Eastern District.

The complaint is in the usual form, except that it originally claimed that the defendant was infringing three letters patent belonging to plaintiff, to wit, Abrahams patent, No. 841,211, dated January 15, 1907, a reissued patent of Lanier No. 14,651, dated May 20 1919, and the Bruckman patent, No. 1,071,027, dated August 26, 1913. By proper amendment and at the trial the plaintiff relied solely on the said Bruckman patent.

The claims of the patent of Bruckman, which plaintiff asserts are valid and have been infringed, are 2, 3, 7, 23, 25, 33, 34, 35, 36, 64, 66, 67, and 69. These claims are well stated as follows (I quote from plaintiff's brief):

"Claim 2. In a machine of the class described (automatic pastry making machine adapted for making ice cream cones and other similar articles—patent specification, p. 1, lines 6 to 13, inclusive): A rotatable wheel (table 4); molding devices carried by said wheel (sectional female molds 13 and male molds or cores 20); means for loading said molding devices as they arrive at a predetermined place (batter tank 68a and pump mechanism 68a—Plaintiffs' Exhibits 44–48, inclusive—which load the molding devices as the molding devices arrive opposite the same); means for discharging the molded product from said molding devices after said product has been molded thereby (the cam 33–31 which effects a preliminary lift of the core, the cam track 67 which unlocks the female mold sections and the butterfly cam mechanism 39 which opens the female molds while the cam 31 holds the cores well within the cones in the female cavities until the female mold sections are fully separated to strip the cones from the baking surfaces and permit the cones to drop from between the mold sections—see position of cores in the fully opened mold unit, Plaintiffs' Exhibit 45; see, also, Defendants' Exhibit 42); means for trimming the product after it leaves the molding devices (the trimming mechanism 69a–69b—Plaintiffs' Exhibits 44–48, inclusive); means for delivering it—the product from the machine (chute 70a

that conveys the cone from the machine to the room below for packing).

"Claim 3. In a machine of the class described (same as claim 2) : A rotatable wheel (same as claim 2) ; molding devices carried by said wheel (same as claim 2) ; means for loading said molding devices as they arrive at a predetermined place (same as claim 2) ; means for baking the contents of said molding devices when loaded (the burners within the semicircular oven cover—see, also, Defendants' Exhibit 45, A, B, C, and D); means for discharging the molded product from said molding devices after said product has been molded and baked (same as claim 2) ; means for trimming the product as it leaves the molding devices (same as claim 2); means for delivering it from the machine (same as claim 2).

"Claim 7. In a machine of the class described (same as preceding claims) : An automatically actuated step by step rotatable wheel (table 4 and the large cam adjacent 76—Plaintiffs' Exhibit 48—and roller lugs 10 co-operating therewith to impart a step by step movement to the table) ; molding devices carried by said wheel (same as preceding claims) ; a stationarily held tank for the substance to be molded (tank 68a) ; means for transferring (conveying, passing over from one place to another—Century Dictionary) the moldable substance from said tank to said molding devices as said molding devices pass said tank to load said molding devices (pump mechanism 68a above molds and the duct from tank 68a to the pump mechanism 68a and the means to operate the pump at intervals) ; means for discharging the molded product from said molding devices at a, predetermined place (same as preceding claims) ; means for applying heat to said molding devices during their movement between the position at which they are loaded and the position at which they are unloaded (same as claim 3).

"Claim 23. In a machine of a class described (same as preceding claims) : A rotatable wheel (same as preceding claim) ; molding devices carried by said wheel and each of said molding devices including a pair of half mold sections (sections 13) that include die members (the cavities having the filigree design shown in the photos), cores for said die members (cores 20), an arm for supporting said cores (arm 2, commonly called core bar) ; means for locking said half mold members together (mold locks 43–44) ; means for releasing said locking means at times (cam track 67) ; means for restoring said locking means to their locking positions at times (gravity plus cam 46, plaintiffs' Exhibit 53) ; means for lifting said cores in said mold sections before said half mold sections are opened (see Plaintiffs' Exhibits 44–47) and for holding said cores lifted until the half mold sections have been opened and again closed (cam track 33–31—see Plaintiffs' Exhibits 44 to 47, inclusive—cores are held projected into the molds until the sections have been fully separated and are not again let down to the molding position until after the molds are closed—see Plaintiffs' Exhibit 46).

"Claim 25. In a machine of the class described : A rotatable wheel, molding devices carried by said wheel, and each of said molding devices including a pair of half mold sections that include die members, cores for said die members, an arm for supporting said cores; means for locking said half mold members together; means for releasing said locking means at times; means for restoring said locking means to their locking position at times (all of the foregoing elements are the same as claim 23) ; means for lifting said cores in said mold sections (beginning of cam track 33–31 which is of relatively slight inclination) ; another means for wholly removing said cores from said mold sections and restoring said cores again to said mold sections (the remainder of the cam track 31 which has an abrupt rise and fall to lift the cores out of the molds over the charging pump and lower them again into the molds after passing the charging pump).

"Claim 33. In a machine of the class described, a sectional mold, a core therefor (all of the foregoing the same as in the preceding claims) ; means for locking said mold sections together (locks 43–44) ; means for locking (holding tightly down) said core in said mold (rollers 73a, inner core bar presser track—Plaintiffs' Exhibit 49—and holding down track 74—Plaintiffs' Exhibits 46–47) ; means for first unlocking said core (core passes out of from under the influence of 73a, inner core bar pressing cam track and bar 74 before the core is or can be lifted to perform the initial step of the extraction function) ; means for subsequently lifting said core in said mold to disengage the molded product (cam track 31 which operates subsequently to the unlocking of the core).

"Claim 34. All that part of claim 34 contained in the first seven lines of the printed copy of patent is the same as claim 33 and in addition it comprises: Means for unlocking said mold sections (cam track 67) ; means

for separating said mold sections when unlocked to discharge the contents thereof (the butterfly cam mechanism *39, 40, 41*—Plaintiffs' Exhibits 48–29).

"Claim 35. This claim is the same as claim 34, plus the following elements, viz.: Means for relocking said mold sections after the contents thereof have been discharged (gravity plus cam *45*); means co-operating with said core for loading said mold after said mold sections have been relocked (the batter charging pump mechanism which delivers a charge into the bottoms of the female cavities to be distributed—to complete the loading function—by the action of the core when inserted into the mold).

"Claim 36. This claim is the same as claim 35 with the following elements added, viz.: Means for relocking said core after said mold has been locked (this occurs when the core bars again pass over roller *73a* and bar *54*, etc.).

"Claim 64. In a machine of the class described (same as preceding claims): A trimming mechanism including a tube having its entrant end sharpened (defendant provides a plate *69a* with holes drilled through the same providing a right angled edge, i. e., a sharpened edge); a pivoted pusher for engaging the article to be trimmed and pushing it through said tube (the pivoted pusher *69b*—Plaintiffs' Exhibit, 46); means for delivering the article to be trimmed to said tube (the chute *75*); means for reciprocating said pivoted pusher at intervals to engage and disengage said tube (cam devices *76*—Plaintiffs' Exhibit 48).

"Claim 66. In a machine of the class described (same as preceding claims): A rotatable wheel (same as claim 3); molding devices carried by said wheel and each including a sectional mold *13* and a core *20* therefor; means for supporting said mold sections (the mold carrying arms by which they are mounted on the wheel); means for opening (butterfly cam *39*) and closing (springs *35* and mold locks *43* which effect the final tightening together of the female sections) said mold sections at times; means for supporting said core (core bar *21*); means for slightly lifting said core while said core remains in said mold sections before said mold sections are opened to thereby strip the molded product from said core (cam *33–31*).

"Claim 67. This claim is substantially the same as claim 66, except that it states more in detail the extraction procedure in an additional phrase, viz.: Means for holding said core, after it has been lifted, to project into the molded product until said mold sections have been opened to discharge the molded product (this is clearly present in defendant's machine in the cam *31*—see Plaintiffs' Exhibits 44–49).

"Claim 69. In a machine of the class described (same as preceding claims): A rotatable structure (wheel *4*) including a set of molding devices, said set of molding devices comprising a sectional mold *13* and a core *20* therefor; an arm *21* pivoted on an axis in a plane at right angles to that containing the axis of rotation of the rotatable structure (the pivot of *21* is horizontal and lies in a plane at right angles to the vertical plane containing the axis of the wheel *4*); means securing said core to said arm (cap screws shown in the photos—Plaintiffs Exhibits 44 and 48); means for opening and closing said sectional molds (butterfly cam *39*, springs *35*, etc.); means for moving said arm on its pivot to remove and restore the core from and to the sectional mold (this is the abrupt part of the cam *31* acting in conjunction with the rotation of the wheel to completely remove the cones from the female molds so as to pass over the pump at the charging station and again return the cores into the female molds after the molds have been charged); means for supplying batter to said molding devices when said core is out of said mold (the pump charging mechanism *68a*); means for turning said rotatable structure (lugs *10* and the large cam lying just in back of the cam *76*—Plaintiffs' Exhibit 48); means for baking the batter in the molds (burners and ovens); means for discharging the contents of said mold (the entrant portion *33* of cam *31* which is timed to hold, in a slightly lifted position, the core within the cone while the mold opening cam *39* operates to separate the female mold section)."

The defense, in addition to denying plaintiff's title, denies infringement, and urges that the Bruckman machine lacks utility and is inoperative, and that the prior art shows all Bruckman's claims to have been anticipated.

[1] As to the defense of lack of title, I am not convinced that this is very strenuously urged, but I dispose of it by stating that, in my opinion, Albert E. Dieterich is the present trustee of the legal title, and a decree here will amply protect all parties.

As to the defense of noninfringement, while this will be more fully referred to later, it seems to me that the plaintiff's and

defendant's machines are practically alike in their functions and in the general combination. While, to be sure, there may be details that are not exactly similar, yet, so far as I can see, one seems to be a fair copy of the other.

[2] As to the defense of invalidity, it would seem, that this Bruckman patent has passed successfully through the fire of repeated investigation and decision by the courts; each time being held valid, and in one instance held to be a "pioneer" patent.

So much for the general situation, as it appears, after carefully refreshing my memory from a reading of the testimony, and an examination of the excellent and exhaustive briefs submitted by counsel.

Taking up now, the defense of noninfringement:

It appears that F. A. Bruckman, filed his application in the United States Patent Office for an automatic pastry making machine on May 11, 1910. A patent was duly granted to him on August 26, 1913, its number being 1,071,027. This is the patent in suit.

Prior to the entry of this Bruckman machine, it seems that the field of manufacture of ice cream cones was unsatisfactorily covered by machines generally known as Valvona type machines. These consist of a mold plate containing a series of cone-shaped recesses, and a core plate carrying a series of conical-shaped cores; the apparatus being arranged so that, when the mold plate and core plate were brought together, a core entered a recess in the mold, leaving a slight cavity between them, for the reception of the pastry, which was baked in that position, and, when properly baked, the mold plate and the core plate were separated, and the baked cones were then removed by hand. This necessitated manual lifting out of the baked cones. The work was hot, slow, and laborious. It was carried out under conditions usually unsanitary.

The demand for ice cream cones was considerable, and the cost price was correspondently large: the cones costing from $15 to $17 per thousand.

Bruckman was a cone baker. He had gone through all the toil and difficulties in this then prevailing method. He saw that what was needed in the art was an automatic machine, which would commence with the pouring of the batter into a reservoir, eliminate all handling, and continue until the cones, properly baked and ready for the market, were compactly "nested" and packed in a

container. This was a problem that he set about to solve.

It is interesting to note that, after his patented machine had come upon the market, the price of cones dropped to approximately $3 per thousand or about one-fifth the former price. In addition, the demand increased, not only because of the quantities that could be turned out, but because of the sanitary condition surrounding the process. Today, it is claimed, that approximately 500,000,000 cones are being made yearly, on machines under the Bruckman patent, and that practically one-fourth of all the ice cream cones are made on machines embodying the Bruckman idea.

It would seem, therefore, to be important to inquire most carefully into the question of why Bruckman should not enjoy a limited and reasonable monopoly, which would be his, if what he discovered was a new and useful invention.

A description of Bruckman's machine was given by plaintiff's expert, Frank L. O. Wadsworth, who has had many years of experience in scientific investigation, and for 17 years had been intimately associated with the art of manufacture of ice cream cones. I quote from the record:

"Frank L. O. Wadsworth: A. I will try first of all to give a simple word picture of this apparatus, without going into any detail as to the various mechanical features. The machine comprises a rotary table, which carries on its periphery a number of mold units. Each of these mold units consist of what is known as a female mold, that comprises two sections that can be opened sidewise with respect to each other, and each of those sections contains what are termed female mold cavities, that are so formed that when the mold sections are brought together we have a complete conical cavity, or a series of complete conical cavities in the female mold unit. Each mold unit also comprises a series of male mold elements, that are mounted together on a bar that can be raised and lowered so as to project these male units into the female mold cavities, or raise them therefrom during the operation of the machine. The machine also comprises certain instrumentalities for charging the molds with the batter at the time when the male elements are raised out of the female mold cavities, and then lowering the male elements, or cores, as they are turned, into the female mold cavities, and thereby spreading the batter that has been deposited

in the female mold cavities into what is termed a cone blank, consisting of wet sticky batter, that is afterwards baked to forms. The machine also comprises, of course, a baking oven, through which the mold units are passed as the wheel revolves and during that passage through the oven the wet batter is heated to expel the moisture content and form solid condensed cone articles. After the units have passed around through the baking oven, they are brought to a discharging position, where the cones are removed from the mold units by the following sequence of steps: First, while the female mold units are still held locked together, the male units or cores are slightly lifted so that the surface of the cones is stripped from the inside surfaces of the cones. * * * Then, after the cone has thus been freed from the core unit the core is left projecting down into the mold cavity, slightly lifted, of course, from the interior of the cone, and while it is so held, the female mold sections are unlocked and opened up. Then, if the cone does stick, as it usually does, to one side or the other of the female mold cavities, the core which is held down in the baked article acts as a stripping finger to pull the cone away from the side of the mold to which it adheres. The core remains stationary, the mold sections open from it, and, if the cone tends to travel, it is brought against the stationary core, and the core acts as a finger to strip off the cone from the side of the cavity to which it adheres. Then the cone drops by gravity, and it is caught in a trimming mechanism. I will stop just a moment to explain why the trimming mechanism is necessary.

"When these female mold cavities are charged with batter, it is impossible to inject into those cavities exactly the right amount of batter to make the finished product. To be on the safe side, an excess amount of batter is injected. Then the core is brought down on the charge of batter, it is spread, and a portion is forced out over the top of the female mold sections, forming what we call a head sheet, which generally holds all the baked cones together. That is so, if there are four cones formed in each female unit, those four cones will be united by the head sheet, which is spread over the top of the female mold units. That head sheet must be removed, and the purpose of the trimming mechanism is to remove it and leave each cone a finished product, to be put in the packing cases. The trimming mechanism is simple, comprising a plate having four cavities of the size of the large end of the cone, and a second plate to one side of the fixed plate which can be rocked back and forth on the fixed plate, or from it. In the operation the parts are timed so that when each set of four is discharged and dropped into the trimming mechanism a rocker arm is thrown up out of the way, and, as the cones drop in the holes in the plate, the rocker arm is brought on top of them and forces the cone through the holes below the head sheet. The finished cones drop into proper receptacles, where they are packed for shipment."

The defendant's machine is apparently made under patents known as Lewison, Nos. 1,389,209 and 1,309,962, and is thus described by Mr. Wadsworth:

"Q. Now, Mr. Wadsworth, you examined the defendant's machines at their factory in June of this year, did you not? A. Yes, sir; and also in April of this year.

"Q. I wish you would describe to the court the construction and mode of operation of the machines which you examined, using such photographs as have been offered in evidence, and also such drawings as you may have in addition to the photographs. A. Again I will attempt to give a word picture of the machines before proceeding with a detail explanation of its parts. Generally stated, the machine comprises a large rotary table, which is mounted on a central vertical axis, and which can be revolved step by step on that axis. This table carries on its outer periphery a number of mold units, each of which comprises a pair of female mold sections that can be opened or locked together, as required, and a female mold element, or core element, which consists of a bar that is pivoted on the rotating frame of the machine, and which carries core elements that can be lowered into, or raised from, the female mold cavities during the successive steps of the operation of the machine. The machine further comprises a baking oven which covers about one-half of the periphery of the wheel, and through which the mold units are revolved step by step as the operation proceeds. It further comprises a pump mechanism by which the female mold units are charged with batter at a predetermined point in the step by step movement, and after which the male mold elements, or cores, are lowered into the charged female mold cavity and served to spread the batter therein to cone blank form.

"The machine has also a locking or pressing mechanism by which the male core ele-

ments are locked down into the female mold cavities during a portion of the complete revolution of the mold-carrying wheel. The machine also has, just beyond the exit end of the oven, an arrangement of cam-actuated instrumentalities by which the male core elements are first lifted slightly from the interior surfaces of the baked cone before the female mold sections are opened. This preliminary lifting of the cores serves to detach the male elements from the interior surfaces of the baked articles. Just after this detachment has been effected, the machine, in its continued step by step movement, brings the female mold units in such a position that they are first unlocked and are then opened, while the male core elements still remain in their lowered or slightly lifted position with respect to the female mold, and this opening of the female mold units while the cores are in this lowered position serves to detach the baked articles from either side of the female mold cavity to which they may adhere. After this detachment has been effected, the continued movement of the machine opens the female sections still further, and permits the completely freed article to drop out of the open sections by gravity, and fall on chutes which convey the articles to the trimming mechanism.

"That trimming mechanism is one of substantially the same character as I have just described, and comprises a trimming die plate having holes which are substantially the same in size as the upper ends of the finished cone and a rocking trimming plate so timed as to be pushed down on the top of the head sheet after the cones have fallen into these cavities in the trimming die plate, and by that movement the head sheet and the projecting portions at the upper end of the cones are detached, and the finished cone falls into another chute which delivers it from the machine to packing tables on the floor below.

"The Court: Very roughly speaking, the difference indicated to me was, in filling the mold of the defendant's machine they used a pump, and the other is filled by dipping the core in the batter.

"The Witness: Practically the only difference, your honor, except as to details of mechanism. * * * I might state in this connection, to avoid possible confusion, that defendant's machine revolves clockwise instead of counter clockwise, as plaintiff's machine does. That might avoid some confusion in subsequent discussion."

It seemed to me, after listening to the descriptions by all the experts and examination of the exhibits (neither machine being before me in completed form), that the defendant's machine is practically a copy of plaintiff's, with the exception of certain mechanical changes.

The defendant claims, however, that its machine is radically different. It is insisted that the present Bruckman machine is not the machine covered by the Bruckman patent; that the latter is inoperative; that important differences between Bruckman's and defendant's machine are that the defendant's machine has no means for restoring a mold lock after same had been restored to locking position simply by gravity; that defendant's machine has no core lock, and therefore has no releasing and restoring means of a core lock, as it has no holding means, except that, for a short distance, it has a series of rollers which force the core down into the molds after the escape of steam; that from then on the core is held in the mold simply by gravity. Defendant also claims that the extraction feature is not the same; that the real Bruckman machine has an extraction function that is inoperative.

Plaintiff's witness Wadsworth has this to say about such alleged differences:

"A. There is no substantial difference between defendant's machine and the Bruckman patent machine. As respects certain parts, they are almost identical. As respects other parts, they differ as to details of mechanism, such, for example, as the particular instrumentalities that are used in locking the female mold units together, and the particular instrumentalities that are used in lifting and lowering the core bars, and the particular instrumentalities used in locking the core bars down in position. In making that statement, of course, I have not overlooked the fact that in defendant's machine the female mold units are charged with batter from a pump, and in the Bruckman patent by a leapfrog mechanism, which I described.

"As respects details of mechanism there are, of course, marked differences between those two devices for charging the female mold cavities, but, as respects the nature of the operations, there is not any difference, because in the case of the leapfrog mechanism, as I explained, the batter collects on the points of the cores, and is deposited in the bottom of the female mold cavity, and is afterwards spread to form by the pressure of the male core elements on the deposited

drop of the batter, and that is exactly what happens in the defendant's machine, where the charge, or drop of batter, is injected into the female cavity from pump orifices, and afterwards spread to form by the gravity pressure of the male core elements. The nature of the whole operation that is effected by the two machines is absolutely the same, both as to the order of steps, as to the functions performed by the individual parts in carrying out those steps, and as to results that are accomplished."

Against this, defendant's expert, Joseph Farley, claimed that defendant's machine differed even from the Lewison machine, which plaintiff claimed defendant's machine was.

"Q. The defendant's machine has been referred to by the plaintiff's experts as the Lewison machine; I wish you would state whether or not that machine is the same as the machine disclosed in the patents, Exhibits 57, 58? A. No; it is not. There are a great many points of difference between the defendant's machine and the machine showing in the Lewison patent. The raising of the core bars is different. The locking means for the cores shown in the Lewison patent are not used in the machine, and a great many of the other features which I do not think we need to go into details on."

Also Mr. Farley proceeded to say that the Bruckman patent machine was inoperative in fifteen minor ways and seven major ways. A brief extract from his cross-examination may not be amiss.

"Q. And I understand it is your opinion these fifteen points are points that can readily be cured by mechanical skill. If that is so, I won't go into them. A. My opinion on that is, as far as any one of the points individually is concerned, if a mechanic were to attempt to construct a machine of the patent and only have one or two such points to correct, he would have no difficulty, but when he ran into fifteen of these so-called minor points, and in addition the correction of one would involve the correction of some other parts of the mechanism, I think it presents quite a serious obstacle to the skilled mechanic who would attempt to build the machine of the patent.

"Q. You have not stated definitely whether it is your opinion a skilled mechanic could correct the several points of error or not? A. Each one of those points could be corrected by a skilled mechanic.

"Q. Now, taking up the major points of inoperativeness, we have already discussed the leapfrog timing device. The next point, as I recall it, had relation to the batter feed. You stated that the batter tank interferes with the operation of the toggle links, as I recall it. What do you mean by that? A. I do not recall whether I used the words 'interferes with the operation of the toggle links.' If I did, it was an inadvertence. What I think I stated, and what I intended to state, was that the batter tank, if placed in a position where the core bars could get into it, would not permit the passage of the toggle links past the tank as the wheel rotated.

"Q. That the tank would interfere with the passage of the toggle links as the wheel rotated, is that it; in other words, the tank was too close to the machine? A. Yes; that is all.

"Q. Isn't that a matter of designing and proportioning the parts so as to have them clear each other ? A. That involves the change of so many parts there. If you move the batter tank out further, or move the mold units in further, or shorten the toggle links, or make the rollers thinner, you run into so many complications that I do not see how it would be possible for an ordinary mechanic, or a skilled mechanic, to correct that by any slight change by merely dimensioning the parts.

"Q. Wouldn't it be obvious to use four chutes here instead of one? A. It might be obvious to use four chutes instead of one, but to make the chutes in such a way as would release the bottom end of the cone always downwardly and the top end in proper position to my mind is not an obvious thing. It is done in defendant's machine by using a V-shaped chute. I think that is quite a clever solution of the problem, and does not appear obvious.

"Q. Yes; nearer the horizontal. A. Yes.

"Q. If that were done, that would avoid the difficulty? A. If properly worked out it could be avoided in that way.

"Q. The next point of major inoperativeness was the alleged choking of the trimming mechanism by the piling of scrap between the trimmer tubes in these spaces here? A. I think I grouped that with the other points.

"Q. There were seven points altogether, and I have that down here as the sixth. Did you ever make tests in trimming mechanism like that to determine whether that was an actual fact or not? A. No.

"Q. In defendant's machine you say that the pusher comes down and crushes the cone

through the holes. What becomes of the piling up of batter? A. They have a pivoted plate that sweeps over the top of the plate after each trimming operation and pushes off.

"Q. You could blow it off too with a blower, couldn't you? A. I suppose there are many ways of doing it."

A great deal was also made in the examination of Mr. Farley, both on direct and on cross, of the amount of lift to a core as shown in the diagrams or drawings that relate to the length of the core.

"Q. Now, Mr. Farley, isn't it a fact that, if the core is say 2⅜ units or 2⅜ inches on the scale in this drawing, the lift is only one-quarter of an inch, or about one-ninth the depth of the cone? A. You mean the lift shown in the drawing is one-quarter inch?

"Q. Yes; one-quarter here, and measure your core, and it is 2⅜ on here, and that would be one-quarter, say one-eighth to give you the benefit of it, one-eighth the depth of the cone? A. No; it is not a fact.

"Q. What is it then? A. It is as I stated before. The actual lift—I do not know how you made the measurements you are making—by referring to Figure 3 of the drawing the top of the core is located at approximately midway between the edge of the bolt showing at the edge of the core bar and the edge of the roller, and in fact even with the end of the core bar. Now, if we take the lift of the core bar at station B and put our proportional dividers on there, you will find the extent of opening of the proportional dividers is slightly over seven-sixteenths of an inch. Putting the other end of the dividers, we will call it seven-eighths of an inch, it is one sixty-fourth beyond seven-eighths. The first measurements I made were made on the dotted lines shown at 14d at station A1, and that would account for the discrepancy.

"Q. That is a diagrammatic showing. It is not shown as an absolutely accurate position, is it? A. It is probably diagrammatic."

Again, on the cross-examination of Mr. Wadsworth by counsel for defendant, an effort was made to show that the Bruckman machine was disclosed as an inoperative machine, as per the following extract:

"At all the other positions the molds or die parts are locked together and move as one. What do you say as to that? A. I would say the statement, under your understanding, does not fully agree with the drawings.

"Q. No; it is directly contrary to it, isn't it? A. Yes; and describes an operation that is impossible as the machine is constructed.

"Q. As the machine is constructed? A. Yes; as the machine shown in the patent—

"Q. No; as the machine is constructed, you said. A. As the machine shown in the patent is constructed.

"Q. The patent states they all move together except at those four positions. Now you say the patent is incorrect? A. No; I say the patent must be considered as a whole, drawings and specifications.

"Mr. Fetherstonhaugh: No.

"A. It is a perfectly immaterial detail, however.

"Q. Is there not some claim made in the patent for that very thing, 'loosely swiveling of the cores'? A. I think there is a claim.

"Q. Of course there is; and it is immaterial? A. As far as actual operation of the Bruckman machine is concerned, yes.

"Q. Mr. Wadsworth, which do you consider the better, from your experience, the leapfrog mechanism or the pump mechanism for feeding the batter into the mold? A. Both mechanisms have their own particular advantages. In some respects the leapfrog mechanism is more advantageous; in other respects the pump mechanism is more advantageous."

Finally, Mr. Farley, offers this explanation for that portion of defendant's apparatus which apparently functions, as in plaintiff's machine, to lock the core bars, although no such function is claimed for it by defendant; it being asserted that this is but a safety device:

"Mr. Farley: I spoke before of the generation and evolution of steam through the baking, and as the core bars pass through the oven there is a possibility that the bars will be raised by the pressure of the steam, and as the burners which are located above the core bar are located quite close to the top of the core bar, if the steam causes the core bar to be raised beyond a certain point, the projecting heads of the bolts will strike against the burners and strip the burners off of the machine."

On summation, counsel for defendant had this to say:

"Now, it is not entirely a question of inoperativeness as a defense, although that is a defense here; it is something more or

something less, as your honor may see fit to view it, and that is that, if there is any invention here for a fully automatic machine, Bruckman never made it; it was made by my brother Dieterich and his draftsmen, or both of them. They supplied the things that Bruckman did not know how to supply to make the thing operative, to make it operative with the proper co-ordination and timing without which you have no automatic machine. The very name means timing and co-ordination of the parts. Now, as to this extraction feature, according to the uncontradicted testimony here, the extraction feature does not exist in the mechanism of the Bruckman machine, and it does not exist there because, if you take a core universally or loosely and swivelly mounted, as Bruckman has it in his drawing, and as he describes in the specifications, you withdraw that core from the mold section to the extent to which it is withdrawn; namely, an inch and a half or two inches. You cannot extract, first, because it is out too far, and, second, because, being loosely swivelly or pivotally mounted, the thing will be dragged along by the cone adhering to one of the mold sections, if it so adheres, and breaks through that core, so that that extraction feature does not exist. * * * So far as any broad idea of baking continuously or automatically or for locking or releasing the locks or for pulling out the cores is concerned, all those problems had been solved before, and all Bruckman attempted to do was to operate those kinds of machines by power, and he did not do it until 1911; he certainly did not do it in his patent. Therefore the invention here, if it can be called such, is not a broad invention; it is not a pioneer invention entitling the plaintiff here to any broad interpretation or to any of his claims or other claims under the doctrine of equivalents."

There is no need of taking up more in detail these various arguments and alleged differences; suffice it to say that it seems to me that the present Bruckman machine, so far as invention goes, and that is all that I am interested in, is substantially the Bruckman machine, for which the patent was granted. In other words, Bruckman's ideas, which were novel and useful, appear in this machine, now used by plaintiff, and are covered by the patent issued to Bruckman, while the machine of the defendant presents the very same ideas. Because of certain mechanical changes, which seem to me in no way to go to the merits, this machine of the defendant affords no basis for a finding that, because of such mechanical changes, Bruckman was not the inventor of this, the first real automatic cone-baking machine.

If this was the only question before me, to wit, whether or not, assuming that Bruckman's patent was valid, does the defendant's machine infringe, I would have no hesitation in finding such infringement. However, there is still the question raised, and which must be determined, whether Bruckman's patent is a valid patent in view of the prior art.

[3] I attach no importance to the contention that it is invalid because it is inoperative. The results speak for themselves. I fail to find anything in the present Bruckman machine that cannot fairly be found covered by his patent and disclosed reasonably in his claims. This identical Bruckman patent has been held valid on several occasions.

As Judge Hough has well said "that every man is entitled to have his own case decided on the facts proven in that case is true; but it is not true that triers of fact must lay aside opinions previously gained on the same facts, because new counsel appear to argue them. The whole system of case law depends upon the presumed correctness of previous decisions, though that presumption may admittedly be overset by new facts or by new arguments." General Electric Co. v. P. R. Mallery Co. (C. C. A.) 298 F. 579, at page 581.

We find that this Bruckman patent has been sustained in the following cases: Roberts v. Bruckman (C. C. A.) 266 F. 986; Bruckman v. Stephens (D. C.) 268 F. 374; American Cone & Wafer Co. v. Denaro (C. C. A.) 297 F. 913.

The Roberts Case was in the United States District Court at St. Joseph, Mo. The first decree was on consent, after a trial of four days. The second Roberts decree was the result of a completed trial. In the second Roberts Case it was urged, as here, that the estoppel and limitation of the file wrapper of the Bruckman patent was such that the Bruckman patent could not be given a broad construction. The decree of the lower court holding the patent valid was affirmed by the Circuit Court of Appeals, Eighth Circuit, on June 12, 1920, a rehearing denied October 1, 1920, and a writ of certiorari was refused by the United States Supreme Court. Roberts Cone Mfg. Co. v. Bruckman, 254 U. S. 649, 41 S. Ct. 63, 65 L. Ed. 457.

The next case was the Bruckman v. Stephens suit. 268 F. 374. In this case Judge Van Valkenburgh, District Court, Western District of Missouri, stated (at page 376): "But I am compelled to look upon this as, in the true sense, a *broad pioneer* invention." (Italics mine.)

Finally we come to the third suit in which this Bruckman patent figured, American Cone & Wafer Co. v. Denaro, 297 F. 913. This was a decision by the Circuit Court of Appeals of the First Circuit, decided April 17, 1924, holding the patent, particularly claims 66 and 67, valid, and reversing the lower court which had dismissed the bill. Id. (D. C.) 283 F. 1011. This Circuit Court decision goes thoroughly into the very question now strenuously contended for, concerning the extraction method and the core serving as a finger to strip the cone from either side of the mold, and held that the Bruckman invention as to same was covered by his patent. In fact, no one can read the opinion of Judge Johnson, in the above case, without feeling that it is practically a decision of the very contentions now raised here, and could, in a sense, be the decision of this case.

[4] The defendant, however, argues that the Roberts decision is of no value, for the reason it is mere obiter dictum; that Roberts was estopped by his consent decree in the previous trial, and by his license arrangement, from going into the validity of the Bruckman patent. It seems to me that, while Roberts might be estopped from denying the validity of a patent under which he had received a license and by a consent decree, yet he was not estopped in the later suit from showing the state of the art, as bearing upon the scope of the patent, but whether such claim was there made or not, it is plain that the District Court and the Circuit Court of Appeals went into that feature thoroughly.

The defendant also claims that the Stephens decision should not be considered, for the reason that that trial took but a short while, and the case of that defendant was hopeless; that the defendant presented little or no defense.

Finally the defendant claims as to the Denaro Case that the District Court that dismissed the bill was right and the Circuit Court of Appeals that reversed the District Court was wrong, an argument that does not appeal to me.

In this regard the defendant states: "With all due respect to the appellate court,

we contend that it was wrong, and the District Court right, in their respective decision, but, even if the decision of the appellate court be viewed as right, it can only be so viewed on the facts before that court, and therefore cannot be persuasive, much less convincing or contrary, here, where the record is substantially different." (Brief for defendant, page 7.) Counsel then proceeds to discuss the Denaro Case.

While of course every case does differ somewhat from another yet I fail to find in this case any such substantial difference.

One of the experts for plaintiff (Wadsworth) testified that he had for years devoted a great deal of attention to cone-making machines, and that the great problem, found insurmountable until Bruckman's invention, was the extraction of the cone.

It will be recalled that before Bruckman, the sole idea of getting the cone out of the mold was by hand, unsanitary, slow. Even with a mold dividing, the problem was not solved, for very often the sugar in the pastry made one side of the cone adhere, and the fragile article was destroyed commercially. Bruckman's idea of the dividing mold, plus the automatic delayed retention of the core, acting as a "stripping finger," solved that problem, so that whichever side of the cone adhered, it was delicately pulled away from that side, by this slowly moving core, and the way then made easy for its passage into the trimming mechanism and thence into the "nesting" mechanism.

Defendant, as in the Denaro Case, claims that this extraction feature is not present in the Bruckman patent, that claims 66 and 67, relied on by plaintiff, to cover same, cannot be so construed, and therefore that these claims are void, because of silence in the specifications; yet it seems to me that these very contentions have been decided in favor of the plaintiff by the said Circuit Court of Appeals. First Circuit (American Cone Co. v. Denaro, supra), where at page 915 the court, after discussing said claims 66 and 67, states: "We think, however, that the principle of operation described in them was contained in the original application, construed in the light of the specifications and drawings."

Again defendant in the suit now before me lays great stress on patents covering molding machines with split female molds and coacting cores, referring to such patents as Brookfield & Stivers, 833,235, a machine used in the manufacture of glass insulators, the Croskey patent, 840,994, also relating to

the making of glass articles, the Dennison patent, 841,644, a machine for manufacturing hollow fence posts, etc. Defendant relies on these patents to show that the split mold mechanism, as used by Bruckman, was old in the glass and other arts.

Permission was granted by the court to defendant and Mr. Farley, defendant's expert, to make an ice cream cone in a mold of a glass-making machine, and the results were exhibited. It is needless to say that the result of the experiment was neither convincing, nor did it indicate that Bruckman had not solved a problem in pastry cone making which up to that time had not been solved. Furthermore, both the Circuit Court of Appeals, in the Denaro Case, at page 917, and Judge Van Valkenburgh, in the Stephens Case, supra, at page 376, held that the glass art was not an analogous art. Each of these courts had before them these patents relating to the glass art.

Finally an examination of the patents alleged to represent the prior art fails to show a disclosure of a completely automatic pastry cone-manufacturing machine such as Bruckman's.

To be sure defendant has cited a great number of patents, some relating to the pastry-making art, and some relating to other arts. In view of the above decisions confirming the Bruckman patent it would seem unnecessary again to go into each of these patents with the same detail that would be required of me had not this Bruckman patent been thus before the courts. However, I do not see any particular prior patent, now cited, which could be said to change the situation heretofore existing in the pastry-making art.

Such patents as the Butzke German patent, No. 43,864, the Baker British patent, No. 20,043, and the Baker patent, No. 712-473, the Marchiony patent, No. 746,971, the Abrahams patent, No. 841,211, the Hama patent, No. 866,273, the Lanier and Driesbach, No. 922,004, and many other similar patents, fail to show a completely automatic machine. Most of them require the handling of the cone at some point in the making. Some of them make no pretension to represent anything but a single element in the combination.

The Bruckman patented machine is not, however, a mere aggregation or assembly of single elements, each doing only what it had formerly done. It is "a new machine of a distinct character, and functions and produces a new result, due to the joint and co-operating action of all the elements." Reckendorfer v. Faber, 92 U. S. 357, 23 L. Ed. 719; Pickering v. McCullough, 104 U. S. 318, 26 L. Ed. 749; Brinkerhoff v. Aloe, 146 U. S. 516, 13 S. Ct. 221, 36 L. Ed. 1068.

Other patents, such as the Lanier patent, No. 1,257,497, involved the use of the solid mold, and do not disclose the important principle of extraction shown by the Bruckman patent and machine.

Other patents, such as the Bohlig, No. 1,047,122, and the aforementioned Lanier patent, would also appear to be not a part of the prior art, and they were before the examiner, who found no interferences. Also, according to the expert Henry J. Savage, they are inoperative.

In addition to these patents, cited by defendant on the theory that they form a part of an analogous art (reference has already been made to the glass art patents) I may also mention the Krell patent, No. 303,936 (before the examiner) and the Wilson and Dole patents, 797,247, relating to glass insulators. Then there are the patents of Bovey, No. 125,012, and Caldwell, No. 206,-771, relating to machines for making clay bricks, the Paxon patent, No. 231,679, relating to a punching mechanism, as well as the Thurber patent, No. 669,331, and then there is the Leming patent, No. 813,901, relating to a concrete block apparatus, and a patent relating to making sewer pipe, to wit, the Johnson patent, No. 771,911.

Thus it seems to me that, examining all these patents, cited by defendant, as prior art, the solution of the problem solved by Bruckman still does not appear. True, certain elements were disclosed, and possibly, if you could imagine Bruckman, possessed of all this technical information, and carefully studying same, as we now can, after a trial, he might have found a hint here and there leading him along the road of experiment to his goal of invention; but it seems to me that nowhere, singly or collectively, does it appear from those patents that a disclosure of what was ultimately discovered by Bruckman appears, nor does a situation appear from any or all of them which an ordinarily skilled mechanic would see at once, and without further experiment would adopt and thereby make a Bruckman machine.

Again, it is quite persuasive that, with this potentially large and lucrative business dragging along, and inventive minds, skilled in the art, seeking to solve the problem, with all this alleged wealth of prior art open and disclosed, and a rich and certain reward

awaiting the solution, not until Bruckman's machine came upon the market did the business of cone making make the great stride in advance.

Upon the appearance of this machine, the demand enormously increased and was met commercially. Prices dropped to one-fifth of the former cost. Great numbers of manufacturers immediately used the Bruckman, or machines with Bruckman's invention, and constant imitation, which is the sincerest form of approval, particularly in a money-making business, sprang into life. Certainly something must have been discovered by some one that was new and useful and would make money for the user.

While, therefore, because each case must be decided on its own facts, I have, after careful examination, come to the conclusion that this Bruckman patent is a valid patent. I have also followed the decisions of the previous courts, above referred to, holding it to be valid. I have also come to the conclusion, on the facts here, that defendant's machine infringes this valid patent heretofore granted to Bruckman, and accordingly direct a decree for plaintiff.