## TEXTILE MACH. WORKS v. LOUIS HIRSCH TEXTILE MACHINES, Inc.

District Court, S. D. New York.

Feb. 3, 1936.

Howson & Howson, of Philadelphia, Pa., for plaintiff.

Darby & Darby, of New York City, for defendant.

LINDLEY, District Judge.

Plaintiff, manufacturer of full-fashioned hosiery knitting machines, brings this suit for infringement of claims 1, 3, 14, and 15 of patent No. 1,713,628 issued May 21, 1929, to Schletter. Defendant, the American sales representative of a German manufacturer of knitting machines, sells the latter in America and manufactures and sells in America the specific attachments charged to infringe. Defendant denies validity and infringement. The patent in suit was held valid and infringed in Textile Machine Works v. Hofmann, by Judge Avis in (D.C.) 4 F.Supp. 837, affirmed in 71 F.(2d) 973 (C.C.A.3). The Supreme Court denied certiorari. 293 U.S. 601, 55 S.Ct. 117, 79 L.Ed. 693.

The patent in suit covers an attachment to be applied to a flat knitting machine of the Cotton type for making full-fashioned hosiery. Such a machine is complete in itself and is old in the art. The device of the patent, when added to the old machine, is adapted to operate in co-operation with all the regular parts of such a knitting machine previously installed and in use, or furnished as part of the equipment of new machines. The "Cotton" machine manufactures full-fashioned hosiery and is distinguished from other old machines, of such types as circular and independent needle machines and other similarly designed primarily for the making of underwear.

The patent drawing illustrates only certain sections of the frame members of a knitting machine, but the specifications, description and claims indicate clearly that the patented device is to be attached to a complete, operable "Cotton" machine. In order to arrive at a correct understanding of the issues, some discussion of the Cotton machine is advisable. A typical example of such a machine shows sections for knitting 24 stocking legs at one time, the operations upon one section being duplicated simultaneously on all the others. There are some 12,000 needles. All movement originates from and is controlled by one cam shaft. To add an attachment, performing additional functions requiring automatic operation, involves the location of additional power devices on the single cam shaft and raises the problems of synchronization of the attachment with other mov-

ing parts of the machine and avoidance of interference therewith.

Operating parts of the knitting machine include needles, sinkers, guides, carrier bars, stops, and numerous other mechanical parts, all co-operating in a complete automatic machine. The yarn guides are mounted on reciprocatory carrier bars, running lengthwise of the machine, each bar carrying one guide for each knitting section. The total reciprocating movement of the bar is the width, approximately, of a single section, so that the yarn guide may be caused to traverse the entire width of the section and put into position the yarn to be utilized by the needles of that section in the knitting operation. Such reciprocation is accomplished by mechanism operated from the main cam shaft.

The limitation upon the lateral movement of the bars is automatically controlled by the end stops, which can be adjusted, automatically in order to change the stroke of the carrier bars, in one direction only. This operation is referred to because it is required in fashioning, or, otherwise speaking, the "narrowing" of the stocking to produce one approximately the shape of the human leg. "Narrowing" involves not only the adjustment of the end stops gradually to shorten the stroke of the carrier bars with their yarn guides, but also the operation of elements known as narrowing points, which pick up some of the outer loops of the fabric from their needles and transfer them to inner needles, thus "narrowing" the fabric. These narrowing points move both horizontally and vertically, the vertical movement being produced by slides, controlled by pawl and ratchet mechanism, operated from the main cam shaft.

Though there is in the machine a reversely threaded spindle, which moves the slides, causing a vertical movement from side to side, this spindle should not be confused with one similarly described, constituting a part of the device of the patent in suit. The latter carries stops for controlling the reciprocatory movement of the carrier bars by co-operation with abutments placed at suitable positions.

Narrowing involves another operation, namely, the adjustment of the end stops to shorten the throw of the yarn guide carrier bars. Further detailed description is not essential; but it is to be observed that the narrowing mechanism is a unit which constitutes a part of the old machine and

that when the narrowing operation is completed the end stops and the slides are returned to their initial positions by the turning of the spindle by hand in a direction opposite to that in which they rotate in the narrowing operation. This is termed "racking-out."

The Cotton machine includes leggers and footers. It has as one of its attachments the so-called split sole attachment. It has long been in common use in making split seams, and this function is referred to in the patent as being well known.

Schletter's attachment is a device to be added to the machine we have been discussing and intended to make possible other and additional results. Its essential parts are the reversely threaded spindle, stops mounted thereon capable of being moved toward and from each other by rotation of the spindle in opposite directions. Ratchets are provided at the end of the spindle, adapted to turn the same in one direction or the other. With mechanical connection, it is possible to operate the ratchets by power from the main cam shaft. There is included a mechanism for determining which of the ratchets is to be operated, which in turn determines the direction of rotation of the spindle. There are two pattern chains, one of which determines the time of operation of the spindle, and the other, the direction of rotation. The means for operating the ratchets, which need not be discussed fully, is mentioned in the patent as "pattern controlled means for determining the time of operation of the spindle." The mechanism for determining which of the pawls will engage the ratchet is described by the patentee as "pattern controlled means for determining the direction of rotation of the spindle." The stops shown in the device are a well-known form of split-seam stop, having an undercut portion and capable of being oscillated, when an open or so-called "herring-bone" seam is to be formed. The claims relied upon are not directed to the specific form of stops shown, nor to split-seam stops as distinguished from splicing stops, nor do the claims call for oscillating stops or include the oscillating means as a part of the invention. The patentee expressly states that his concept is not limited to the use of these specific stops for this specific purpose.

I have mentioned some of the elements of the mechanism without attempting to create a mental picture of the combination. This I do not deem essential, in view of the

record, which will be submitted to the court of review.

As pointed out, the device is intended to co-operate with a full-fashioned machine, to which it is attached; and its function is to provide means for fashioning such designs as clocks upon full-fashioned stockings, doing both reinforcing or splicing work and split-seam work. This purpose, the patentee said, his device accomplished by an action, whereby "yarn-guides can be accurately controlled to lay a yarn over a distance less than the full length of a course being knitted, as for reinforcing or for so-called split-seam work, wherein sections of fabric are connected by suture seams. For this purpose I preferably employ opposed stops with conjoint controlling means, arranged to move them toward or from each incrementally, but any equivalent means or devices may be employed which will effect the purpose of the invention."

In the ordinary operation of the knitting machine, the yarn guides are controlled only by the end stops and lay the yarn over the full width of the fabric being knitted, that is, from selvage to selvage. In contrast, Schletter's purpose was to furnish accurate control for yarn guides which lay the yarn over a distance less than the full width of the fabric or less than the full length of the course being knitted. This action produces "reinforcing" or split-seam work. Reinforcing is the knitting of additional thread over a particular area of the main body of the fabric, producing in such area a double thickness. Splicing, as used by the patentee, refers to the same operation. "Split-seam work," according to the patentee, means inserting in the body of the stocking an area formed by separate thread or fabric, as distinguished from a reinforced area, involving a separate thread knitted in to reinforce the main body of the fabric. The two types of work are commonly known as reinforced or splicing and as split-seam or insert work.

In practical operation, certain of the carrier bars travel the full course of the fabric being knitted and are controlled by the end stops. When a clock is inserted, the carrier bar laying the thread for the insert is controlled by auxiliary stops, an abutment on the bar contracting at each end of the auxiliary stops with the inner face of one of the same. Simultaneously, other carrier bars for laying the thread on either side of the insert are controlled by the end stops at one end of their throw and by the auxiliary stops at the other, an abutment on the carrier bar striking against the end stops at one end of its route and on the outer side of one of the auxiliary stops at the inner end. During the knitting of the inserted portion, the position of the stop is adjusted automatically by the turning of the spindle to form a junction along zigzag lines inclined to the wales and courses of the web.

In making the reinforced or spliced clock, the thread forming the main body of the fabric is laid by yarn guides on carrier bars having the full stroke and controlled by the end stops. The thread for the reinforcement is laid by guides on other carrier bars, traveling less than the full width of the fabric and controlled by the auxiliary stops, which co-operate with abutments properly placed on the carrier bars.

These two operations are specifically referred to in the patent, but there is another type of operation properly referred to as selvage reinforcement, that is, reinforcing work, commencing at the edge or selvage of the fabric and running in therefrom. As contrasted with insert and reinforced work, in areas removed from the edges, in selvage reinforcement, while the main yarn guide carrier bars are controlled by the end stops, the carrier bars with the guides laying the yarn for the reinforcing portions are controlled between the end stops and the outer faces of the auxiliary stops. The inner margins of the reinforced portions can be made along lines extending diagonally to the direction of the wales and courses of the fabric, these lines extending diagonally inwardly and outwardly as desired, the adjustment of the auxiliary stops being accomplished automatically.

These various operations illustrate the availability and utility of the device when attached to a full-fashioned flat knitting machine in knitting stockings and include a large number of kinds of ornamental work, made desirable by the demands of the purchasing public.

Plaintiff claims that Schletter, by adding to the conventional control of the yarn guide carrier bars by the end stops, auxiliary stops for controlling certain of the said carrier bars, traveling less than the full course of the knitting, said auxiliary stops being automatically adjustable to and from each other, their operation being automatically timed for proper synchronization with the end stops and other operating parts of

the regular machine, gave to the full-fashioned hosiery machine a scope of operation not previously possessed, which permitted the making of ornamental inserts or split-seam work, ornamental reinforced designs, such as shadow clocks, and an ornamental reinforcement at the selvages on either legger or footer, in all the varied forms which these several kinds of work may take. This, it is claimed, he did by means of a comparatively simple attachment readily added to an old machine or made a part of a new one.

The claims sued on are set forth in the margin, 1, 3, 14, and 15.[1] "The straight knitting machine, with cooperating yarn guide carrier bars," is the conventional Cotton machine for full-fashioned hosiery. The opposed "stops for certain of the carrier bars" are the auxiliary stops previously mentioned. By limiting the stroke of the carrier bar at each end of its travel, they make possible the split-seam work mentioned. These auxiliary stops also act as opposed stops in making reinforced or shadow clock work. "The reversely threaded spindle for moving toward and from each other to vary the stroke of the bars controlled by said stops" implies automatic operation in both directions in accordance with the specifications of the patent. Claims 3 and 14 cover the same combination as claim 1. Claim 15 is somewhat more specific.

Defendant contends that plaintiff's commercial device does not follow the patent because, first, solid nonoscillating stops have been substituted for the oscillating stops shown in the patent drawing; and, second, the timing and selecting mechanisms in the commercial form are operated by a single pattern chain instead of two as shown in the patent. While the patent shows one specific form of stop well known in the art, that is, a stop with an undercut portion, capable of oscillation, the patent, in its specifications, clearly indicated that the inventor did not intend to limit his alleged invention to these specific stops. He said: "My invention, however, is not limited to the use of these specific stops for this specific purpose, but they may be used for all purposes for which stops are used." Similar language appears elsewhere in his specifications. I am convinced that in any substitution in the device actually produced of solid stops for undercut stops, there is no material departure from the patent, but rather an adherence to its teaching. In other words, under the evidence, stops and their functions were well known. The patentee did not invent a new form of stop, but his idea, as I understand it, was to control the movement of stops laterally in the machine. This he did by his reversely threaded spindle and automatic reversing means in conjunction with the regular control of the full-travel bars by the end stops. In making the open or herring-bone split the undercut stops were oscillated. In making the closed split, the oscillating means were rendered inoperative, without oscillation, just as if they had been solid stops. The evidence is that the undercut stop was provided, not only with the oscillating means, but also with means for putting the oscillating mechanism out of operation, so that the stops could be used either as solid stops or as oscillating stops. The practice of utilizing the stops in their two capacities is apparently well known in the art, and makes possible the closed split seam as well

[1] (1) In a straight knitting machine having co-operating yarn guide carrier bars, a pair of opposed stops for certain of said carrier bars which have a stroke less than the full width of the fabric being knitted, and a reversely threaded spindle for moving said stops toward and from each other to vary the stroke of the bars controlled by said stops. (3) A device as in claim 2, said pattern controlled means being constructed and arranged to turn said spindle either to increase or to decrease the distance between said stops. (14) In a straight knitting machine, a set of yarn guide carrier bars for operating yarn guides traveling less than the full width of the fabric being knitted, a spindle having reversed screw threads, stops operated by said spindle, means for turning the spindle in either direction, pattern-controlled means for determining the time of operation of the spindle, and pattern-controlled means for determining the direction of rotation of the spindle. (15) In a straight knitting machine, a set of reciprocating yarn guide carrier bars including bars having a stroke less than the width of the fabric being knitted, pair of stops for said guides, a reversely threaded spindle extending lengthwise of the machine, the respective stops being connected to the reversely threaded portion of the spindle for moving the stops simultaneously toward and from each other, pattern-controlled means for determining the time for such movement, and correlated pattern-controlled means for independently determining the direction of such movement.

as splicing work. I think a fair interpretation is that the specifications of the patent not only disclose the alternative use of solid stops without the undercut but further that the specific form of stop with its oscillating means, involved a disclosure to those skilled in the art of a well known form of stop, to be oscillated in making the open split and to be disconnected and not oscillated in making a closed split or for reinforcing or splicing work. Apparently Schletter preferred to make an open split, in vogue in his time, but the device which he disclosed was capable of use in the manner known to the art in making closed splits, and the fact that when the plaintiff commercialized its device it omitted the means for oscillating the stops, the open split being no longer in vogue, involved no departure from the patent.

Plaintiff has substituted a single pattern chain for controlling both the timing and selecting mechanisms in place of the two separate chains shown in the patent, but the one chain, by virtue of the mechanism provided, performs the function of both the former chains. The device exemplifies elimination of one of two chains and replacement with one performing the same function. The claims of the patent are not so framed in describing the timing and selecting mechanisms as not to include such simplifications. Equivalency is clear.

Commercial success followed the production of the attachment, which now forms an essential feature of substantially all flat knitting machines. Testimony of various manufacturers fully establishes this fact. The German machines, if not equipped with such attachment, are supplied therewith by the purchaser.

Defendant contends that Schletter was anticipated, and counsel relies upon thirteen patents cited in Textile Machine Works v. Hofmann, supra, and now cites twelve additional patents.

The claims of the patent in suit cover in the full-fashioned flat knitting machine, with its provided reciprocatory carrier bars, a combination of full-travel thread bars, controlled by the end stops short-travel bars, which co-operate with the full-travel bars, in making designs on the hosiery, auxiliary stops for controlling the short-travel bars, the reversely threaded spindle, for moving the stops toward and from each other, automatic means for moving the auxiliary stops in either direction, means for timing the operation of the spindle and means for selecting the direction of rotation of the spindle.

Of the twelve patents cited here for the first time, the following: Laue and Timaeus (German) No. 21,332 of 1881; Black (British) No. 13,905 of 1887; Rowlet (U. S.) No. 500,953 of 1893; Chipman (U. S.) No. 1,163,970 of 1915; Mather (British) No. 7,476 of 1837; Roe (British) No. 1,991 of 1869; Willat et al. (British) No. 573 of 1871; Claringburn (British) No. 7,068 of 1891; Kilbourne (U.S.) No. 19,370 of 1858; Lieberknecht (German) No. 117,153 of 1900; DePass (British) No. 10,405 of 1884; Oesterreich (U.S.) No. 1,644,688 of 1927, relate to machines which have no auxiliary carriers, but employ merely full travel carriers. I cannot find in any of them any pertinent relation to the subject-matter of the patent in suit. Practically all of them relate not to an attachment for the Cotton machine, but to one of entirely different type, the independent needle machine, without reciprocating carrier bars. For these as well as other reasons appearing in evidence, these patents clearly do not anticipate.

Lieberknecht (German), No. 117,153, has to do only with the control of full-travel carrier bars. Under his construction no designs can be made by the machine. The device supplies in a knitting machine of the Cotton type for the ordinary end stops of the latter, that patentee's equivalent. DePass (British), No. 10,405, is intended to make designs upon hosiery, but by means entirely alien to that employed in the instant patented device. It does not involve the control of reciprocating carrier bars, but employs the carrier control of the independent needle machines. This patentee proposed a specific form of design, and his device is entirely limited to that, having no capability for the various kinds of designed work of which the attachment in suit is capable. There are in most of the prior art patents thus far considered no reversely threaded spindle or otherwise.

Oesterreich, No. 1,644,688, discloses a drum attachment for doing design work on the Cotton machine. There is here again no reversely threaded spindle, and consequently no automatic mechanism for controlling such spindle. The patent covers an attachment for producing designs, but such productions follow a process entirely different from that of Schletter.

The Chamberlain publication, which is likewise new in this case, refers to a reversely threaded spindle and to use of same for reducing or increasing the traverse of yarn guides. Plaintiff does not contend that the patent in suit covers such device. The article contains no teaching of the use of a reversely threaded spindle in the manner of Schletter or to accomplish his purpose.

■ There remain thirteen patents cited, which were before the court in the Hofmann Case. That suit was defended by the same counsel for a different client, and the president of the present defendant attended the trial of that case, testified therein, and assisted in the defense. The defendant contributed to the defense of the former suit, and the defendant in the former suit is contributing to the defense of this suit. These facts bring the present case very nearly within the doctrine of res adjudicata, and though it may be that not all of the elements of that doctrine necessary to an estoppel by judgment exist, so far as the prior art relied upon in the former case is concerned, this trial is in the nature of a rehearing of the evidence heard in the prior suit in the District Court (4 F.Supp. 837) the decree of which was affirmed by the Circuit Court of Appeals for the Third Circuit (71 F.(2d) 973). This court is loath to rehear issues previously decided by a court of co-ordinate jurisdiction, whose decree has been affirmed by the court of review. However, in the absence of applicability of the doctrine of res adjudicata, present defendant has a right to a full hearing of its defense.

Claringburn (British), No. 4967, has to do with a Cotton machine so modified as to narrow the fabric at the selvage or at some distance in from the selvage, the purpose being to provide ladies' garments with gores or pockets. Claringburn contains no reversely threaded spindle; has nothing to do with carrier rod control and pertains only to narrowing, which is old. The spindles may operate in opposite directions, but not in order to position auxiliary stops or otherwise except to produce narrowing.

Sowter, No. 478,527, comes within the same classification. He was dealing with narrowing.

Lieberknecht, No. 981,663, shows a reversely threaded spindle for controlling the travel of yarn guide carriers, the purpose of which is to reduce the shocks of blows incident to the striking of the carrier bars on the stops. The device relates solely to the control of full-travel carrier bars and lacks entirely auxiliary stops for controlling the short-travel bars. The spindle is automatically operated in one direction only, and in the other by hand. The device will not accomplish Schletter's purpose.

■ Woodward, No. 19,627, contains only the regular stops for full-travel bars. There are no auxiliary stops; no short-travel bars, and the reversely threaded spindle is not that of Schletter. Defendant offered testimony that certain changes might be made in the device whereby it might be adapted to produce one of the types of work covered by Schletter's patent. I do not believe the modified device follows the teaching of Woodward. But more than that, it is not sufficient to constitute an anticipation that the device might by modification be made to accomplish the function performed by the patent in suit, if it were not designed so to do by its maker or adapted when actually used, for the performance of such functions. Topliff v. Topliff, 145 U.S. 156, 12 S.Ct. 825, 36 L.Ed. 658.

Gee, in his patent No. 1,014,753, devised an attachment for making reinforced or spliced designs away from the selvage. He controlled his short-travel bars by fixed stops, which have no movement in a longitudinal direction, as in Schletter. The attachment is capable of doing only one kind of work, and only one design can be achieved by the use of any one form of pattern abutment. There is no reversely threaded spindle. The device cannot be employed for split-seam or insert work, and has certain other defects not necessary to be considered.

Landenberger, No. 1,134,749, is a drum device similar to that of Oesterreich. The drums are operated in one direction only, and the device fails to meet Schletter's claims, as there are no auxiliary stops movable automatically toward or from each other and no reversely threaded spindle so to move the stops. This attachment has been practically superseded by the attachment of Schletter. Drum devices are used to some extent at the present time, but they follow teachings different from those of Schletter.

Schletter, No. 1,198,482, is very similar to that of the Landenberger's device just considered. It was intended to make the pointex heel reinforcement, and utilized,

for that purpose, a drum device. It fails to anticipate, for the same reason that Landenberger fails.

Cecka, No. 1,180,568, covers a device for making reinforced portions in the medial parts of the fabric, that is shadow clock work. He has no other purpose in mind, and the device fails to comprehend the concept of Schletter.

Cecka, No. 1,217,411, has to do with reinforcement of the selvage. It is similar to Cecka patent, No. 1,180,568, and fails to meet Schletter. The Examiner allowed Schletter's claims over this reference. These two patents are of especial interest in this case because of the fact that they represent attempts made by the defendant's associates to solve at least a part of the problems Schletter coped with. The devices were crude and of no practical merit, but are of some weight upon the question of invention by Schletter.

Zwicky, No. 1,608,285, employs a reversely threaded spindle, but one entirely different from that of the patent in suit.

Cotton, British No. 208,362, utilizes the reversely threaded spindle as a one-way device for controlling auxiliary stops to make the pointex heel. It is similar to Gotham and Kayser, in evidence under prior uses. The spindle operates in one direction only and lacks the automatic reverse and other mechanism included in Schletter. Furthermore, it appears that Schletter's date of invention was prior to that of Cotton.

Lamb and Noon, British No. 15,129, covers a machine for making split-seam designs of a particular pattern. There is no carrier bar which carries a guide for laying thread across the full length of the fabric. There is no reversely threaded spindle for controlling auxiliary stops. It is suggested that with certain changes Lamb might accomplish something other than what he claimed. But the suggested changes involve supplying new elements and building a new combination.

Muller, in No. 1,564,438, was dealing with an independent needle machine. He employed no reciprocating carrier bars, no combination of short-travel bars and full-travel bars with fitting automatic control. Muller was not dealing with full-fashioned machines. The function of his spindle was not to control auxiliary stops, as in plaintiff's combination, but to perform another function. Muller could not accomplish the various types of work contemplated by Schletter. Furthermore, the reference is not sufficiently early to anticipate Schletter's invention.

Gotham and Kayser employ attachments for making pointex heels, involving a single kind of selvage edge reinforcement which was used for some years to make pointex heels. Apparently these devices were equivalent to that illustrated in the Cotton British patent. They are no longer in use, for the reason that the Schletter attachment has superceded them because it will make, not only pointex heels, but various numerous types of ornamental work. These prior uses involve one-way devices. The threaded spindle is operated by mechanism in one direction only and is racked out by hand. They contemplated no automatic operation in both directions, no selective or reversing mechanism, and the auxiliary stops are not utilized as opposed stops.

The Nusbaum machine was used in the manufacture of underwear and bathing suits. It was not adapted to make full-fashioned hosiery, but utilized regular fashioning screws or spindles at the opposite ends of the machine and the regular end stops to control the travel of short-travel bars, laying in the thread for designs. In this device there were auxiliary stops at each end of the machine to do the work which would be done ordinarily by the regular end stops. It was impossible with this machine to achieve the purposes of Schletter. It could make garments with straight selvages only. The device lacks the essence of the Schletter invention, namely, an attachment to be added to the regular full-fashioned machine, providing auxiliary stops, automatically controlled, additional to and co-operating with the regular end stops on the machine, so that while the machine is knitting full-fashioned hosiery, short-travel bars are automatically controlled to lay in the yarn necessary to make the desired ornamental designs.

■ Some of these patents have to do with control of narrowing points; others with control of full-travel bars; others are single purpose devices. Others show specially designed machines, but do not relate to an attachment for full-fashioned hosiery, and others relate to independent needle machines, not involving the control of carrier bars. A new combination cannot be anticipated by piecing together the various elements from disconnected patents. Thus in Davis Mfg. Co. v. Levin Bros., 8 F.(2d)

972 at page 976, the Circuit Court of Appeals said: "It is a familiar doctrine in the law of patents that, after an invention, an infringer may not piece together from a number of disconnected patents in the same or other arts a combination of features which would render the patented combination invalid; particularly when there is added a new and distinctive efficiency as the result of the combination made by the patentee as distinguished from combining a number of old elements, all functioning as before without that new and distinctive result." See, also, J. L. Owens Co. v. Twin City Separator Co., 168 F. 259, at page 265 (C.C.A.8th); Black & Decker Mfg. Co. v. Baltimore Truck Tire Service Corp., 40 F.(2d) 910, at pages 912, 913 (C.C.A.4th); Wisconsin-Minnesota Gas & Elec. Household Appliance Co. v. Hirschy Co., 28 F.(2d) 838, at page 841 (C.C.A.8th); Bragg-Kliesrath Corp. v. Farrell, 36 F.(2d) 845, at page 849 (C.C.A.2d); Bassick Mfg. Co. v. Larkin Automotive Parts Co. (D.C.) 19 F.(2d) 939, 940.

I am of the opinion that none of the prior art cited anticipate Schletter.

 It is contended that no invention was achieved, but after careful consideration of the evidence, I am of the opinion that Schletter accomplished invention. Instead of the old combination intended for one purpose, he brought about a new attachment adapted not only for selvage reinforcement of any desired form, but as well for split-seam work, fancy insert work, away from the selvage, and spliced designs, such as shadow clock work. He thus provided for the full-fashioned hosiery machine, for the first time in the history of the art, a single, efficient new attachment for accomplishing a wide variety of work never before accomplished by any single device. In dealing with a new combination, the question of patentable invention turns not merely upon the question of the extent and nature of the mechanical changes, but rather upon the question of novelty of function and result. The addition of mechanism for accomplishing the purpose of the new combination must be preceded by the conception of the purpose and the recognition of the availability of the old device, with the addition of the new necessary mechanism, for the accomplishment of the new purpose and added functions. By adding the automatic reverse, with the necessary operating, selecting, and timing mechanisms, Schletter produced a new combination, giving to the auxiliary stops functions which they did not possess in the old pointed heel device, and producing an entirely new result. He turned a device intended for a single purpose into one of general utility, opening up a whole field of new uses, which those familiar with the old attachments had not conceived. Such steps as this show invention. Diamond Rubber Co. v. Consolidated Rubber Tire Co., 220 U.S. 428, 31 S. Ct. 444, 55 L.Ed. 527; Temco Electric Motor Co. v. Apco Mfg. Co., 275 U.S. 319, 48 S.Ct. 170, 72 L.Ed. 298; Bragg-Kliesrath Corp. v. Farrell (C.C.A.) 36 F.(2d) 845; Thropp & Sons Co. v. De Laski & Thropp Circular Woven Tire Co. (C.C.A.) 226 F. 941, 947.

Defendant has insisted that Schletter's device is inoperative. Its point is that while the spindle, the means for operating the same and the timing and selecting mechanism are all clearly shown and described, including a pattern chain, which operates the selective mechanism, and a pawl which moves the pattern chain, there is obscurity with respect to the lever connection by which the pawl is actuated from the main cam shaft. To support this contention is the testimony of an expert witness to the effect that he cannot determine from the patent drawing the pawling mechanism for the chain. But this witness finally said, on cross-examination, that the specifications disclose that the lever for actuating the pawl was intended to be operated by the cam shown in the drawing. His final position was that the only thing missing from the patent drawing was the arm connecting the lever at the front of the machine to the pawl at the rear. The connection is not bodily shown in the drawing, but it seems obvious to the court that any one familiar with drawings, reading the specifications, would know and appreciate the exact form of the connection desired and intended. I am of the opinion that patentee has described his invention in such a manner as to meet the requirements of Revised Statutes, § 4888, as amended (35 U.S.C.A. § 33).

 Patents are never struck down by reason of trivial defects which do not prevent those skilled in the art from putting the device into practice. That the alleged defect relied upon by defendant here is of such trivial character seems too clear to require further comment. Webster Loom Co. v. Higgins, 105 U.S. 580, 26 L.Ed. 1177; Sun Ray Gas Corp. v. Bellows-Claude Neon

Co. (C.C.A.) 49 F.(2d) 886, 887; Bickell v. Smith-Hamburg-Scott Welding Co. (C.C. A.) 53 F.(2d) 356.

What has been said in this connection applies with equal force with regard to failure to show in the drawings narrowing cams, which are an essential part of a knitting machine.

From a careful consideration of the evidence, therefore, I am of the opinion that Schletter achieved invention; that he is not anticipated; that he has met the requirements of the statute in his description of his invention and that his patent discloses no inoperative defects.

In the alleged infringing device, a single chain for controlling the timing and selecting mechanism has been substituted for the two pattern changes of the patent. This is another way of saying that the defendant here, as did the defendant in the Hofmann suit, has followed plaintiff's commercial form of device, which the court has previously said is not a departure from the teaching of the patent. The substitution of one chain with additional buttons, for two chains, accomplishing the same purpose as two chains, does not prevent infringement, just as it is no departure from the teaching of the patent.

■ Defendant contends also that in its device it has provided stops which are of special improved character, adapted to make a two-needle split seam, whereas in Schletter the split seam must be a four-needle split, which is alleged to be less desirable than the other. I do not understand that the patent, in the claims herein involved, is limited to any particular form of split seams. Rather the claims are directed, not to any specific form of stop, but to a combination of stops of well known character, either for split seams or splicing and controlled and operated in a particular manner in connection with the parts of a full-fashioned knitting machine to bring about a wide variety of designs on hosiery. I do not conceive that infringement can be escaped by the use of a form of stops which permit the making of a particular seam which the defendant claims is more desirable than the specific form shown in the patent, where various forms, including the one being considered, are claimed. It appears that defendant's attachment may be utilized to make the four-needle split and for splicing exactly in the same manner and form as the plaintiff's commercial attachment. In the end, what defendant does is to employ an attachment embodying plaintiff's combination with an added device for raising and lowering pin stops in order to adapt the device to a particular form of split seam. Such addition, utilized only with plaintiff's combination, cannot relieve defendant of the charge of infringement. Walker on Patents (6th Ed.) p. 496, § 409; Temco Electric Motor Co. v. Apco Mfg. Co., 275 U.S. 319, 48 S.Ct. 170, 72 L.Ed. 298; Malina v. Grisman (D.C.) 20 F.(2d) 406; Barber v. Otis Motor Sales Co. (D.C.) 231 F. 755, 762; Stebler v. Riverside Heights Orange Growers' Assoc. (C.C.A.) 205 F. 735, 739.

■ Furthermore, inasmuch as the added connection is adapted to be put out of operation and the pin stops used as ordinary split-seam and splicing stops, the device accomplishes exactly the result of Schletter. A machine that infringes part of the time is an infringement, although it may at other times be so operated as not to infringe. Wright Co. v. Herring-Curtiss Co., 211 F. 654, 655 (C.C.A.2d); Westinghouse Elec. & Mfg. Co. v. Precise Mfg. Corp. (C.C.A.) 11 F.(2d) 209. I find, therefore, nothing in the defendant's device that excuses it from the charge of utilization of the combination of the Schletter patent.

■ I might, with propriety, have rested my decision largely upon the prior adjudication in the Third Circuit, for a strong presumption arises from such previous decision. Thus, the Court of Appeals for this Circuit, in Gormley & Jeffery Tire Co. v. U. S. Agency, 177 F. 692, said: "The importance of securing uniformity in the law as administered in the several circuits in patent causes is so great that a decision of a court of coordinate jurisdiction should be followed by this court in every case where the questions presented can fairly be regarded as doubtful." See, also, Warren Bros. Co. v. City of N. Y., 187 F. 831, 835 (C.C.A.2); Adt v. E. Kirstein Sons Co. (D. C.) 259 F. 277, 278; McLaren Products Co. v. Cone Co. (D.C.) 7 F.(2d) 120, 128; Rousso v. Elco Towel Cabinet Co. (D.C.) 28 F.(2d) 300. But I have not felt satisfied to rely solely upon the strong presumption arising from the earlier adjudication. I have considered not only the evidence identical with that submitted in the prior litigation, but, in addition, new evidence. Only by so doing have I felt that the court's obligation to the defendant can be fully performed.

There will be a decree of validity of the claims sued upon, infringement by defendant and a reference to the master for an accounting for damages. Proper form may be submitted.